The defendant was indicted and convicted for the crime of arson in the first degree. Alabama Code 1975, Section 13-2-20. Sentence was three years' imprisonment.
 I
The defendant contends that his conviction was had on the uncorroborated testimony of accomplices. The State contends that the defendant, aided by Raymond Mills, hired Pete Thomas, James Miller and Ross Donahoo to burn his residence in order to collect the insurance.
The statement of facts contained in the brief of defendant's appellate counsel represents a thorough, fair and accurate version of the testimony presented at trial. The State, in its brief, recognizes this statement as being "substantially correct and moves to adopt it as its own." Therefore, the statement of facts in this opinion is substantially identical to the facts as stated in the brief of the appellant. *Page 579 
The State's first witness was Kenneth "Pete" Thomas. Thomas testified that he had been indicted for arson in this case, but he had not been arraigned, tried, nor had his case been set for trial. Thomas stated that he had not been promised that he would not be prosecuted or would not receive any additional time for this offense in exchange for his testimony.
Thomas stated that on a Monday he met with Raymond Mills (whom he already knew) at Mr. Mills' insurance office on 6th Avenue, South, in Birmingham. Mills told him a man wanted to pay $1,000.00 to have his house burned. Thomas told Mills that he would not do it for $1,000.00. Mills gave Thomas the defendant's telephone number and told him to call the defendant and make his own deal. Mills told Thomas that he wanted $750.00 out of what Thomas was paid. Mills also told Thomas that he had to go out of town Saturday and Sunday. Thomas called the defendant from a phone booth right outside Mills' office about ten minutes after this conversation, and told the defendant that he wanted $2,500.00 to do the job. The defendant allegedly told Thomas to get back in touch with him in two or three days.
On Wednesday Thomas called again and the defendant agreed to the $2,500.00. Thomas told him to have a duplicate made of his front door key and leave it with Mr. Mills' secretary where Thomas would pick it up. Thomas also told the defendant to leave town on Friday night and when he returned the house would be burned. Thomas was to receive half-payment before the job was done. Thomas was to call the defendant again on Friday afternoon about the money.
On Thursday night, Thomas talked with Ross Donahoo and James Edward Miller and they agreed to burn the house down on Friday night for $250.00 apiece. On Friday afternoon, Thomas called the defendant and asked if he had had the duplicate key made. The defendant told him that it was waiting for him at Mills' office. Thomas testified that he picked up the key on Friday afternoon.
Thomas further testified that on Friday evening, at about 7:00 P.M., he met the defendant at the Golden Rule Barbecue on Highway 78 in Irondale. Only the defendant and Thomas were present, since Thomas had left Miller and Donahoo at an omelet or a sandwich shop about a mile from the Golden Rule. The defendant told Thomas that he had not been able to get the money because the banks were closed. They called Mr. Mills in Nashville, Tennessee, from a pay phone in front of the building. Mills guaranteed payment of the money on the following Monday if the defendant was not able to pay. The defendant gave Thomas directions to his house in Leeds. About 45 minutes later Thomas drove to the defendant's house and saw the defendant locking the front door. The defendant's wife and children were in the car and they appeared to be preparing to leave.
That night, Thomas, Donahoo and Miller filled two one gallon plastic jugs and a five gallon can with gasoline at an Exxon service station in Irondale. They arrived at the defendant's house about 12:30 or 12:45 A.M. Miller and Donahoo got out of the car and spread the gasoline in the house and lit the fire. After leaving the scene, Thomas threw the key and jugs away and put the can in the trunk of his car. About 15 minutes after leaving the house they drove back by and saw that the house was burning. On Saturday Thomas and Miller called Mills in Nashville and told him the job was done. On Sunday, Thomas and his ex-wife, Joyce, drove back by the house and saw that it was burned. On Monday afternoon, Mills paid Thomas at his office. That same afternoon Thomas paid Donahoo and Miller.
Sometime after this, Thomas was arrested by the Mountain Brook police on another charge. At that time they took from him a notebook he kept in his wallet containing some telephone numbers. Among them were numbers for Raymond Mills and the defendant (listed as "Tom"). The notebook was a portion of a little black phone book. The Mountain Brook police gave the notebook back to Thomas after copying it, but *Page 580 
Thomas threw it away. Thomas identified State's Exhibit No. 2 as being a xerox copy of the items in his wallet when he was arrested, including the telephone book.
Ross Donahoo testified that he pled guilty to arson in this case and had already served his time. He is now on parole.
Donahoo testified that the burning happened in January of 1978. Thomas asked him on a Thursday if he wanted to burn a house. They were supposed to have accomplished the job on Thursday night but Thomas got high and for this reason Donahoo would not go that night. Thomas met the defendant Friday at the Golden Rule Barbecue in Irondale. Donahoo later testified that he could not say who the other man at the Golden Rule actually was.
Donahoo testified that he, Miller, and Thomas went out to the defendant's house on Friday night. Only he and Miller went in the house. Together they doused the house with gasoline both upstairs and downstairs. Miller lit the fire and they left.
James Edward Miller testified that Joyce Thomas, Kenneth Thomas' ex-wife, had contacted him and told him that Mills had "a job for us or that (Thomas) had a job that (Mills) wanted him to do and he was trying to get in touch with us." On Wednesday, Miller saw Thomas who asked him if he would burn a house in Leeds. On Wednesday evening he and Thomas went to Mills' office to get a key. On Friday evening about 7:00 P.M. he went with Thomas and Donahoo to the Golden Rule Barbecue in Irondale. He identified the defendant as the man he saw there. Miller and Donahoo then went to a Waffle House or Omelet Shop nearby. Thomas called Mills from the omelet shop and then told Miller that Mills had agreed to guarantee the money.
Miller testified that they were going to do the job on Thursday but could not because Thomas got high on Demerol. On Friday night they purchased eight gallons of gasoline at the Exxon Service Station in Irondale. Then they went to the defendant's house. Miller and Donahoo went in and spread the gasoline around upstairs and downstairs. Then Miller lit the match and they left.
Miller testified that he saw Thomas give Joyce Thomas (Thomas' ex-wife) $600.00 after the burning of the house. On Monday evening Thomas paid Miller and Donahoo a total of $500.00 at a motel on Bessemer Road.
When Sergeant Wade of the Sheriff's office interviewed Miller around March of 1978, Wade promised he would speak to the District Attorney about not prosecuting him for arson. Miller was also told that the arson charge against him would be dismissed if he testified in this case and in the case against Raymond Mills.
Lila Joyce McGaughy, the ex-wife of Kenneth Thomas, testified for the State. On a Sunday afternoon at the end of January, 1978, she rode with Thomas to Leeds and saw a partially burned house. One or two days before, on Friday or Saturday night, Thomas, Donahoo, and Miller were at her house. She heard "bits and pieces" of a conversation between the three men concerning burning a house. She heard the names of "Raymond Mills" and "Mr. McCoy" during this conversation. The only location she heard mentioned was the City of Leeds, and, when asked what she remembered of the conversation, she testified, "they were discussing carrying gasoline, having to find something to carry gasoline in and they discussed a fuse box and Mr. Thomas made the statement that they would stop and get some gasoline on the highway." Later that evening Thomas, Donahoo and Miller left her house.
She denied Miller's allegation that Thomas gave her any money shortly after the fire was burned. She was living on Pike Road in Ensley at this time, and thinks, but is not sure, that the telephone was in her daughter's name, Kimberly Diane Doyle; she also thinks that the telephone number was 780-5124 and that the street address was 1702 Pike Road.
Gerald D. Wilson testified that he was working at the Irondale Exxon Service Station in January. He remembers that several men came in and bought gasoline in a *Page 581 
can and some jugs between 10:30 and 2:00 o'clock on a Friday night. He testified that he would not now be able to recognize those people. He stated that in March of 1978 he was shown some photographs and at that time said "there was one that looked familiar, that looked like the one that came and paid the money for the gas."
Sergeant Harry M. Wade, Jr., of the Jefferson County Sheriff's Department testified that he talked to Mr. Wilson on March 9, 1978, and showed him five photographs, including photographs of Donahoo, Miller and Thomas. He testified Wilson at that time identified two photographs, but there was no testimony as to which photographs Wilson identified.
Sergeant Don Isaacs testified that he is the Mountain Brook policeman who took the notebook from Thomas when he was arrested and xeroxed it. A xerox copy of the notebook was introduced into evidence as State's Exhibit 2.
George A. Davis, III, Manager of the South Central Bell Telephone Company at its Five Points West business office in Birmingham, identified the telephone numbers of W.L. Mills and Annie Mai Mills in Nashville, Tennessee; Golden Rule Barbecue in Irondale; Barbara C. Miller; and Diane Doyle, 2117 Pike Road in Birmingham. Using company records, Mr. Davis then testified that the following telephone calls were made:
 DATE TIME LENGTH OF CALL FROM TO ---- ---- -------------- ---- —
1. January 26, 1978 7:43 P.M. 5 minutes W.L. Mills and Defendant's Annie Mai Mills residence Nashville, Tenn.
2. January 27, 1978 6:02 P.M. 1 minute W.L. Mills and Defendant's Annie Mai Mills residence
Nashville, Tenn.
3. January 27, 1978 6:14 P.M. 6 minutes W.L. Mills and Motion Annie Mai Mills Enterprises Nashville, Tenn. (located at defendant's residence)
4. January 27, 1978 6:54 P.M. 4 minutes Golden Rule Mills Barbecue Nashville, Birmingham, Al. Tenn. (charged to Diane Doyle on Pike Road) 5. January 28, 1978 2:43 P.M. 1 minute Barbara Miller Mills (charged to Nashville, Diane Doyle) Tenn.
Faye Smith testified she keeps the billing and long distance call records for the Leeds Telephone Company. She identified the 699-7459 telephone number as listed in the name of Motion Enterprises, at 1809 Rowan Road in Leeds, Alabama, and the 699-7810 number as listed in the name of Tom J. McCoy at 1809 Rowan Road.
From her records she testified that the following telephone calls were made:
 DATE TIME LENGTH OF CALL FROM TO ---- ---- -------------- ---- —
1. January 26, 1978 5:14 P.M. 3 minutes The telephone Mills listed to Motion Nashville, Enterprises at Tenn. defendant's home address *Page 582 
2. January 26, 1978 6:23 P.M. 5 minutes The telephone Mills listed to Motion Nashville, Enterprises at Tenn. defendant's home address
3. January 27, 1978 10:34 P.M. 4 minutes The telephone Mills listed to Motion Nashville, Enterprises at Tenn. defendant's home address
4. January 27, 1978 3:01 P.M. 4 minutes The telephone Tuscaloosa listed to Motion Enterprises at defendant's home address
5. January 27, 1978 4:04 P.M. 1 minute The telephone Mills listed to Motion Nashville, Enterprises at Tenn. defendant's home address
Richard E. Serviss, Jr., a Claims Specialist with State Farm Insurance Company, testified that the defendant's house burned on January 28, 1978, at approximately 2:00 A.M. State Farm Insurance Company insured the house for $88,900.00 and the contents for $44,450.00. There was also an additional living expense rider in the amount of 20% of the building coverage. The insured was Thomas J. and Gloria McCoy. Tommy and Gloria McCoy filed a proof of loss form with State Farm requesting payment of $126,539.52.
On February 22nd, Mr. Serviss went to the defendant's burned house with Kenneth Goodknight, Grover Dunn, and Dave Price. They inspected the house very thoroughly, took photographs, inspected the debris, and took samples for a chemical analysis. They also removed the attic furnace from the house which had fallen to the basement during the fire.
The McCoys had taken out the insurance policy on January 17, 1977. The original coverage was $80,000.00 on the house and the contents' coverage was one-half of the house coverage or $40,000.00. The policy had an inflation clause which automatically increased the coverage by the next year to $88,900.00. The amount the McCoys claimed for contents was $7,500.00 less than the amount of coverage, and the amount claimed for living expenses was $500.00 while the maximum living expenses claimable was $17,780.00.
State Farm did not pay the McCoys' claim. The McCoys then filed a suit against State Farm on the policy on July 13, 1978, which is still pending. Count One of the suit is for $138,539.52, the amount of their claim on the policy. Count Two seeks $250,000.00, charging that State Farm failed to act fairly and in good faith regarding the claim of the McCoys. There were two mortgages on the house, one held by Birmingham Federal Savings and Loan Association and the other by Central Bank, in the total principal amount of $80,000.00 (the amount of the original coverage). After the suit was filed State Farm paid the two mortgage holders a total of $85,512.74, taking an assignment of the mortgages, so that State Farm is now the owner of the mortgages. *Page 583 
Later in its case in chief, the State recalled Mr. Serviss and he testified that the insurance policy included coverage on personal property usual and incidental to the maintenance of the household but specifically excluded automobiles and business property held for sale. He testified that the McCoys' house had five bedrooms, an attached two-car garage, and a full basement. When asked whether State Farm had insured any of the automobiles owned by the defendant, Mr. Serviss stated that State Farm had insured the Thunderbird, did not know about the MG or the truck, did not think State Farm had insured the Camaro because it was not in running condition, and knew that they did not insure the race car because State Farm does not insure that type of car.
Mr. Serviss testified that on February 2, 1978, he took a statement from the defendant asking him questions and tape recorded the questions and answers. The tape was transcribed. At the request of the prosecutor, Mr. Serviss read certain questions and answers from the typed statement. The following information from the defendant's statement was then read into evidence: The defendant told Mr. Serviss that his total mortgage payments per month were $761.11. At the time of the fire he was two months behind on one mortgage and one month behind on the other. The defendant stated that he had listed the house for sale with his mother-in-law and that someone was supposed to look at it on February 2nd. On the Wednesday or Thursday before the fire he moved the MG, the Camaro, and the "old race car" out of his backyard and to a storage garage in Leeds. None of these automobiles was in running condition. On the same day he also moved his fireplace equipment that was in the upstairs garage area to the warehouse. He stated that the fireplace equipment was equipment he had in connection with his fireplace business and he moved it because his mother-in-law was going to show the house for sale and she wanted the house "cleaned". The defendant told Mr. Serviss that at the time of the fire he had gone to Tuscaloosa to see his grandmother who lived with his aunt. They left Friday evening. On the Wednesday or Thursday before he had called his aunt and told her they were thinking about visiting. They arrived about 9:30 P.M. Friday evening. The defendant also told Mr. Serviss that he had had some difficulty with the upstairs furnace unit in his home shortly after they had moved in in the early part of 1977 but that he had not been aware of any malfunction in it recently.
Kurt Frederick Langston testified that he worked for the defendant in January of 1978 doing odd jobs. He testified that the defendant had acquired some warehouse space around the beginning of December, 1977. Shortly thereafter Langston moved some farming tools and "a good bit" of junk from the defendant's garage and house to the warehouse. On Friday, the day of the fire, he moved the fireplace equipment, race car, Camaro and MG to the warehouse. None of the three cars was in running condition. The defendant told him he wanted the things moved because a couple interested in buying a house was going to look at the house on the following Tuesday.
Robert T. Ryan, the owner of a wrecker service in Leeds, testified that he pulled a race car with his wrecker from the backyard of the defendant's home to a warehouse. This was done at the request of Kurt Langston about 1:00 or 2:00 o'clock in the afternoon on Friday, January 27. Langston told Ryan to bill it to the defendant.
Mr. George Townsend, who was in charge of accounting at Birmingham Federal Bank, testified that on March 16, 1977, Birmingham Federal made a mortgage loan to the defendant on his residence in the amount of $55,000.00. He testified that as of January 30, 1978, the defendant was past due on the December and January payments and the February payment was due on February 1. Of the nine payments that should have been made by January, the defendant had made seven. Of the seven, five were late, including the December and January payments which were past due. He testified that the defendant also took out a first mortgage loan on another house *Page 584 
in Leeds on December 28, 1977, with the first payment to be made on February 1.
Kenneth L. Sanders, a real estate loan officer with Central Bank, testified that Central Bank had held a second mortgage on the defendant's residence. At one point in his testimony Mr. Sanders testified that the defendant was at least two months behind on his payments as of January 28, 1978, but later testified that he could not really tell from his records how far the defendant was behind. He did testify that the records show that payment was at least thirty days overdue on eight occasions. He testified that the original amount of the loan was $41,434.80. At the time State Farm bought the mortgage from Central Bank the amount of the indebtedness had been reduced by over $15,000.00.
David Floyd Pylant, Jr. testified he was employed by Southern National Bank. The defendant took out two loans from Southern National on May 13, 1977; one was an unsecured loan in the amount of $587.76 and the other loan was secured by a 1977 Thunderbird in the amount of $8,315.16. As of January 27, 1978, the defendant was about four months behind on the payments on each loan. At some point the Thunderbird was repossessed.
Kenneth Goodknight, a fire investigator for State Farm, examined the defendant's burned house on two occasions, on February 14, 1978, and February 22, 1978. He took photographs on each occasion and made a floor diagram of the house as the result of the two visits.
Mr. Goodknight testified that fires started by flammable liquids have distinctive characteristics and create distinctive burn patterns on the floor. He showed the jury a series of twenty photographs of the remains of the house and explained how characteristics of the fire shown in the photographs were consistent with those of a fire in which flammable liquids were used. He testified that he observed a distinct burn pattern that was in his opinion caused by a flammable liquid.
Some remains of carpet were found in the house and were taken away by a Mr. Dunn for laboratory analysis. Mr. Goodknight testified that in examining the carpet he smelled what was in his opinion gasoline. Mr. Goodknight would not express an opinion as to what part of the house the fire started in, but did testify that if a fire came into contact with natural gas it would create an intense burning in the area in which the gas came out of the pipe connection.
Mr. Grover Dunn, a consulting engineer, examined the defendant's house on February 22, 1978. Mr. Dunn took five samples from the house and ran a test on them to determine the kind of material found in the samples. Three of the samples were positive for light to medium hydrocarbons. Gasoline is a medium and heavy-boiling hydrocarbon, "depending on the fraction you are able to collect as a sample." The other two samples were negative. Mr. Dunn also examined a furnace which had been removed from the house and some tubing and a transformer. He testified that there was no evidence that any of this material caused the fire. In his opinion, gasoline caused the fire.
Mark Lawley, a firefighter for the Leeds Fire Department, fought the fire at the defendant's house. Mr. Lawley testified that he and Phillip Byers were the first to arrive on the scene. From outside the house the only flames he saw were coming through the roof. When he got inside the house the primary fire was at the top of the stairs. The front door to the house was closed but unlocked. Lawley brought some fire hose in the front door and attempted to extinguish part of the fire. The fire spread when he put water on it, which he testified was consistent with his experience in dealing with fires begun by flammable liquids.
The State then introduced into evidence a Tennessee birth certificate of Raymond L. Mills, which lists the father's name as William L. Mills and the mother's name as Annie Mae Glasful.
This concludes the summary of the State's evidence. The State rested its case and the defendant made a motion to exclude the State's evidence, mainly on the *Page 585 
ground that there was insufficient corroboration of the testimony of the accomplices. After extensive argument, the trial court overruled the defendant's motion.
We need not summarize the evidence presented by the defendant and the State's rebuttal evidence in considering the correctness of the action of the trial judge in overruling the defendant's motion to exclude the State's evidence. In determining whether the trial court correctly overruled this motion, this Court can only consider the evidence which was before the trial court at the time the motion to exclude was made. McCord v. State, 373 So.2d 1242 (Ala.Cr.App. 1979); Kentv. State, 367 So.2d 508 (Ala.Cr.App.), cert. denied, Ex parteState ex rel. Atty. Gen., 367 So.2d 518 (Ala. 1978). The evidence before the trial court at the time the motion to exclude was made is all that can be considered in reviewing the trial court's overruling of the motion; but, in reviewing the evidence, it must be viewed in the light most favorable to the State. Livingston v. State, 44 Ala. App. 559, 216 So.2d 731
(1969). Packer v. State, 55 Ala. App. 30, 312 So.2d 601 (1975).
The State, in brief, argues that the following facts and circumstances corroborate the testimony of Thomas, Miller and Donahoo: (1) The motive of the defendant; (2) The facts that on the very day of the fire, fireplace equipment (excluded from the insurance policy covering the house and its contents) and three automobiles (not insured) were removed from the house and yard into a warehouse rented by the defendant; (3) At the time of the fire the defendant and his family (wife and four children) were not at home; (4) The fireman's testimony that the front door of the house was not locked; (5) The testimony of the ex-wife of one of the arsonists that she overheard the names of the defendant and Raymond Mills mentioned in a conversation among the three arsonists; (6) The long distance telephone calls which coincided with the times and places testified to by the accomplices.
The test for determining the sufficiency of the corroborative evidence of the testimony of an accomplice is through a "subtraction process". Thompson v. State, 374 So.2d 388, 389
(Ala. 1979), citing Kimmons v. State, 343 So.2d 542
(Ala.Cr.App. 1977). The test is generally stated:
 "(F)irst, the evidence of the accomplice must be eliminated, and then, if upon examination of all other evidence, there is sufficient incriminating evidence tending to connect the defendant with the commission of the offense, there is sufficient corroboration . . ."
 Miller v. State, 290 Ala. 248, 250, 275 So.2d 675
(1973). (Emphasis added)
This rule is codified in Alabama Code 1975, Section 12-21-222.
Excluding the testimony of the three admitted accomplices, Thomas, Miller and Donahoo, the "other evidence" presented by the State does not tend to connect the defendant with the commission of the arson.
Ms. McGaughy's testimony that she overheard the names of Mills and the defendant mentioned in a conversation among the three accomplices cannot be used to corroborate the testimony of the accomplices because the evidence comes from the accomplices themselves. The conversation Ms. McGaughy overheard was not between the defendant and an accomplice but was only among the three accomplices. An accomplice's out-of-court statements cannot be used to corroborate his own testimony.Adams v. State, 23 Ala. App. 477, 127 So. 254 (1930); Burton v.State, 39 Ala. App. 332, 101 So.2d 564 (1975), cert. denied,267 Ala. 354, 101 So.2d 572 (1958). Compare Woods v. State, 76 Ala. 35
(1884); Hosey v. State, 344 So.2d 1230 (Ala.Cr.App.), cert. denied, 344 So.2d 1235 (Ala. 1977); Smothers v. State,38 Ala. App. 153, 83 So.2d 374, cert. denied, 263 Ala. 701,83 So.2d 376 (1955); Morris v. State, 25 Ala. App. 156, 142 So. 592
(1932), where the corroborating evidence consisted of the testimony of the wife of an accomplice concerning a conversation she overheard between an accomplice and the defendant.
Service station operator Gerald Wilson testified that several men purchased gasoline. *Page 586 
His testimony merely shows preparations for the crime and does not tend to connect the defendant with its commission.
Sergeant Wade's testimony only concerned the identification of the men who purchased the gasoline from Wilson. His testimony does not tend to connect the defendant to the arson.
Sergeant Isaacs took a notebook from accomplice Thomas upon his arrest on an unrelated charge sometime after the arson. Among the telephone numbers contained in this notebook were numbers for Raymond Mills and the defendant.
Just as the out-of-court statements of an accomplice cannot be used to corroborate his own testimony, Adams, supra, Burton, supra, so also the accomplice's personal notebook cannot be used as corroboration of his testimony. The notebook was prepared by the accomplice and contained no writings made by the defendant. The rule in this State is clear that an accomplice cannot corroborate himself. Evans v. State,42 Ala. App. 587, 172 So.2d 796 (1965). Alabama Code 1975, Section12-21-222 states that "(a) conviction of felony cannot be had on the testimony of an accomplice unless corroborated by otherevidence tending to connect the defendant with the commission of the offense . . ." (emphasis added) Even the dying declaration of an accomplice must be corroborated. Burton v. State, supra. In Ballew v. State, 97 Tex.Crim. 325, 260 S.W. 1045 (1924), the court held that a letter written by an accomplice allegedly at the dictation of the accused was admissible in evidence but could not be used to corroborate the testimony of the accomplice.
In Lucious v. State, 38 Ala. App. 484, 486, 87 So.2d 659
(1956), it was held: "Merely finding stolen property where an accomplice states that he and an accused had hidden it in nowise tends to corroborate the accomplice. Such evidence emanates merely from the bare statements of the accomplice." Also in Lotz v. State, 23 Ala. App. 496, 497, 129 So. 305
(1930), the court noted:
 "State witness Poole, an admitted accomplice, gave evidence as to where some of the stolen articles had been hidden by him and the defendant; and witness Gilbert testified that he found the articles thus hidden at the place indicated by witness Poole. In this connection the court in the oral charge held in effect that this was such corroboration as the law required. In our opinion this is not the proper construction to place upon this evidence, for the reason that the defendant's connection therewith is shown only by the testimony of this accomplice, who may himself have placed the stolen articles in the place designated, and there is no fact or circumstance or other evidence, other than his bare statement, which tended in the least to connect this appellant therewith, and the material inquiry as to whether the defendant did in fact commit such act, or participate therein, cannot be substantiated upon the testimony alone of the accomplice, the admitted thief and burglar." (Emphasis added)
The notebook cannot be used to corroborate the testimony of the accomplice. To do so runs afoul of the rule as stated in Anno. 96 A.L.R.2d 1185, 1188 (1964).
 "From the cases examined, it appears that in those jurisdictions requiring corroborating evidence tending to connect the defendant with the commission of the offense, objective evidence which is dependent for its authenticity or relevancy upon the testimony of the accomplice who must be corroborated does not fulfil the requirement, for to hold otherwise would be to say that the accomplice may corroborate himself."
"(T)he testimony of an accomplice may not be corroborated by real evidence, such as a photograph, document, letter, or other writing, where the only testimony authenticating such real evidence is that of the accomplice, which must itself be corroborated." C. Torcia, III Wharton's Criminal Evidence, Section 649 (13th ed. 1973).
In Sorrell v. State, 249 Ala. 292, 31 So.2d 82 (1947), the Alabama Supreme Court found the evidence insufficient to sustain the testimony of the accomplice even though among the facts argued by the *Page 587 
State to constitute sufficient corroborative evidence was the fact that a photograph of the defendant was found among the personal effects of the accomplice.
It is interesting and perhaps indicative of our decision that, on appeal, the State does not argue that the notebook should be used as corroborative evidence.
The testimony of Mr. Davis and Ms. Smith with regard to the information concerning various telephone calls does tend to corroborate the testimony of accomplice Thomas in that their testimony includes facts and circumstances ascertained in checking up on Thomas' version of the affair and includes matters tending to support the truth of his testimony. However, their testimony is not of that class of corroborative evidence essential to conviction for it does not tend to connect the defendant with the crime independently of the testimony of the accomplice. Slayton v. State, 234 Ala. 9, 173 So. 645 (1936);Blevins v. State, 56 Ala. App. 115, 319 So.2d 734, cert. denied,294 Ala. 753, 319 So.2d 739 (1975); Davis v. State, 32 Ala. App. 204, 23 So.2d 612 (1945).
These telephone calls were an attempt to establish a connection between the defendant and Raymond Mills, an alleged fourth accomplice in the arson. However, excluding the testimony of the accomplice, there is not one scintilla of evidence that Mills was in any way involved in the burning of the defendant's residence. For this reason, any evidence connecting the defendant with Mills does not connect the defendant with the crime because that connection is made only by the accomplice. In Lindhorst v. State, 346 So.2d 11, 15
(Ala.Cr.App.) cert. denied, 346 So.2d 18 (Ala. 1977), this Court noted:
 "By excluding the accomplice's testimony as per the test in Sorrell, supra, the missing guns do not connect the appellant with the crime, because it was the accomplice who said the appellant wanted to get weapons from the Johnsons."
Oklahoma has a statute identical to Alabama Code 1975, Section 12-21-222. In Frye v. State, 606 P.2d 599, 607 (Okla.Cr. 1980), the Oklahoma court stated that "corroborative evidence is not sufficient, however, if it requires any of the accomplice's testimony to form the link between the defendant and the crime." Reviewing the State's evidence in this case, we find that the only testimony linking Mills to the arson comes from the accomplices. "The evidence relied upon for corroboration of the testimony of an accomplice must tend to connect the defendant with the commission of the crime independently and without the aid of the testimony of the accomplice." Anno. 99 A.L.R.2d 1185, 1187 (1964).
 "The tendency of the corroborative evidence to connect accused with the crime, or with the commission thereof, must be independent, and without the aid, of any testimony of the accomplice; the corroborative evidence may not depend for its weight and probative value on the testimony of the accomplice, and it is insufficient if it tends to connect accused with the offense only when given direction or interpreted by, and read in conjunction with, the testimony of the accomplice." 23 C.J.S. Criminal Law, Section 812 (b) (1961).
The testimony of claims agent Serviss and bankers, Townsend, Sanders and Pylant did tend to show a motive the defendant could have had for having his residence burned. However, proof of motive alone does not satisfy the statute requiring corroboration. Thompson v. State, 374 So.2d 388 (Ala. 1979);Sorrell v. State, 249 Ala. 292, 31 So.2d 82 (1947); Jacks v.State, 364 So.2d 397 (Ala.Cr.App.), cert. denied, 364 So.2d 406
(Ala. 1978); Brown v. State, 31 Ala. App. 529, 19 So.2d 88
(1944). Even the evidence tending to show the bad or worsening financial condition of the defendant does not paint the picture of a desperate individual on the brink of bankruptcy or the poor house. While the entire conduct of the accused may be surveyed for corroborative circumstances, an opinion, standing by itself, of a trait or likelihood of human conduct would not be of substantive character and is not sufficient corroboration. Davis v. State, 44 Ala. App. 684, 687, *Page 588 220 So.2d 852, reversed on other grounds, 283 Ala. 686,220 So.2d 860 (1968).
The fact that the defendant had some vehicles and business inventory removed from his house and yard on the day of the fire, as testified to by witnesses Langston and Ryan, is indeed a suspicious circumstance. Yet, under other evidence presentedby the State — that the defendant was trying to clean up his house so his mother-in-law could sell it — these suspicious circumstances are entirely consistent with the defendant's innocence. Corroborative evidence must be of a substantive character, must be inconsistent with the innocence of the defendant and must do more than raise a suspicion of guilt.Thompson, 388 So.2d at 389. See also, Senn v. State,344 So.2d 192 (Ala. 1977); Slayton, supra. Evidence which logically and rationally is as consistent with innocence as with guilt does not corroborate the testimony of an accomplice. Ladd v. State,39 Ala. App. 172, 98 So.2d 56, cert. stricken, 266 Ala. 586,98 So.2d 59 (1957); Sorrell, supra.
The testimony of State Farm Fire Investigator Goodknight and Engineer Dunn confirmed that the fire was caused by gasoline and that gasoline was used in the fire. However, their testimony did not connect the defendant with the fire.
Firefighter Lawley testified that the front door to the house was closed but not locked and that the fire was consistent with fires begun by flammable liquids. This testimony does not show, as the State alleges, that the defendant gave the accomplices a key to the house.
These facts taken individually and cumulatively simply do not tend to connect the defendant to the crime although they do show that a crime was committed.
In conclusion, the State presented a wealth of evidence tending only to support the accomplices' versions of the circumstances surrounding the commission of the offense without connecting the defendant to its commission. After surveying the entire conduct of the defendant for corroborative circumstances, Moore v. State, 30 Ala. App. 304, 5 So.2d 644
(1941), Miller v. State, 290 Ala. 248, 275 So.2d 675 (1973), we find that the "fine line . . . between corroborative evidence which does no more than raise a suspicion of guilt and evidence of such a nature that it tends to connect the defendant with the commission of the offense" has not been crossed over.Thompson, 374 So.2d at 389. The evidence in this case compels the same conclusion the Alabama Supreme Court reached inSorrell, 249 Ala. at 292.
 "True, there are circumstances in the case which might be calculated to arouse the curious mind to wonder why they occurred, if defendant were wholly innocent of wrongdoing, but when considered in the light of the governing principles of law above deduced, it is clear the evidence was wanting in the legal requisites necessary to sustain the conviction. The conviction rested on surmise, speculation and conjecture, and the ends of justice require us to enter a reversal . . ."
If the rule that corroborative evidence must do more than raise a suspicion of guilt has any application, it is in this case. Suspicion cannot be heaped upon suspicion to create a reasonable inference of guilt.
The evidence argued by the State as evidence which corroborates the accomplices is not sufficient to corroborate the accomplices because it is (1) evidence which does not tend to connect the defendant with the offense, (2) evidence which corroborates only the commission of the offense rather than the defendant's connection with the offense, (3) evidence which amounts to no more than a suspicion of defendant's connection with the offense, (4) evidence which goes only to motive, (5) circumstantial evidence which is consistent with innocence or, as is sometimes said, does not exclude every reasonable hypothesis of innocence, Fagan v. State, 35 Ala. App. 13,44 So.2d 634, cert. denied, 253 Ala. 444, 44 So.2d 638 (1949);Evans v. State, 42 Ala. App. 587, 172 So.2d 796 (1965), or (6) is evidence which comes from the accomplice himself. See P. Herrick 1 Underhill's Criminal Evidence, Section 185 (6th ed. 1973). *Page 589 
The difficulty of proving arson does not relieve the State of its statutory duty not to convict a defendant upon the uncorroborated testimony of an accomplice. Peacock v. State,369 So.2d 61, 63 (Ala.Cr.App. 1979).
Because the defendant's motion to exclude the State's evidence was due to be granted, a second trial is barred by the double jeopardy clause of the constitution. Burks v. UnitedStates, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978). This judgment is reversed and judgment is here rendered dismissing appellant from further proceedings in this cause.
REVERSED AND RENDERED.
All Judges concur.